No. 2036.—HENRY FRELLSEN *v.* F. C. MAHAN, TAX COLLECTOR.

| 21 | 79 |
| 115 | 382 |

The term "each house" used in articles 33 and 42 of the Constitution of 1868, means a majority of the members elected to either body.

Four-fifths of a *quorum* of each House may dispense with the rule requiring any bill to be read on three several days.

The act of the Legislature, No. 114, approved on the twenty-ninth of September, 1868, levying a tax of one per cent. on the cash value of all the immovable and movable property in the State, according to the assessment rolls for the year 1867 (being the last assessment which at that time had been made), is not retrospective in its operations, and does not therefore conflict with article 110 of the Constitution of 1868.

The selecting the assessment of 1867 (the last one then made), as a basis for a tax, levied in 1868, was a subject which was exclusively within the legislative control. The principle of equality and uniformity enunciated in article 118 of the Constitution of 1868, is not violated by selecting a previous assessment of the property taxed as a basis of estimate of the amount of taxes to be collected.

APPEAL from the Seventh District Court for the Parish of Orleans, *Collens*, J. *Breaux & Fenner* and *Campbell, Spofford & Campbell* for plaintiff and appellee. *S. Belden*, Attorney General, *H. C. Dibble*, *John B. Robertson* and *W. H. Hunt* for defendant and appellant.

### ARGUMENT FOR PLAINTIFFS IN INJUNCTION.

The first question raised by the injunction is, whether the Act No. 114 of the Louisiana Legislature, approved September 29, 1868 (Sess. Acts, p. 149), was passed with the forms and solemnities required by the Louisiana Constitution of 1868.

That Constitution in article 42, declares that "no bill shall have the force of a law until on three several days it be read in each house of the General Assembly, and free discussion allowed thereon, unless four-fifths of the house where the bill is pending may deem it expedient to dispense with this rule."

This provision is imperative and vital, not directory simply. It was said in the People v. Lawrence, 36 Barbour 177, that "no court in New York has yet felt itself authorized or constrained to regard any provisions of the constitution as merely directory."

And in Supervisors v. Heenan, 2 Minnesota 330, it was declared that "the validity of legislation depends upon a pursuance of the constitutional provisions in the enactment, *as that the law shall be read on three successive days*, shall be voted for by a majority of all the members, etc., etc., and the court may inspect the original bills at the Secretary of State's office, and have recourse to the legislative journals."

In Fowler v. Peirce, 2 California 165, it was held that the court may receive other evidence than the record to determine whether a statute was *passed* or approved in accordance with the constitution.

In the People v. Purdon, 2 Hill, 31, Bronson, J. and others held that the court could go behind the statue book and inquire whether an act coming within the two-thirds clause of the constitution of New York was passed by the requisite number of votes, nothwithstanding a certificate of the Secretary of State. Justice Bronson, in that case, well remarked: "If we wish to perpetuate and uphold free institutions, we must maintain a vigilant watch against all encroachments of power, whether arising from mistake or design, or from whatever cause they proceed." His views met the approval of the Court of Errors, in the same case, Purdon v. The People, 4 Hill, 384, and especially of Chancellor Walworth, they holding, with great unanimity, that the certificate of the Secretary of State was not conclusive that the act had passed by the constitutional majority.

In Fowler v. Peirce, already cited from 2 California 163, Chief Justice Murray said: "I am of opinion that there is no difference between declaring a law unconstitutional for matters patent upon its face, though passed regularly, and a law apparently good, yet passed in violation of those rules which the constitution has imposed for the protection of the rights and liberties of the citizen. If such matters cannot be inquired into, the wholesome restrictions which the constitution imposes on legislative and executive action become a dead letter, and courts would be compelled to administer laws made in violation of private and public rights, without power to interpose. The fact that the law-making power is limited by rules of government, and its acts receive judicial exposition from the courts, carries with it, by implication, the power of inquiry how far those exercising the law-making power have proceeded constitutionally." And again (p. 171): "Our constitution has wisely so distributed the powers of government as to make one a check upon the other, thereby preventing one branch from strengthening itself both at the expense of the co-ordinate branches and of the public."

Now let us examine the questions of fact, whether the Act No. 114, when it was in the form of a "bill," was read in each house on three several days, and if not, whether this constitutional requirement was dispensed with by four-fifths of the house where the bill was pending.

The evidence of those facts, if they be facts, must necessarily be of the highest authenticity, that is, *record* evidence, the affirmative evidence

of the journals of each house. For the constitution has not left the grave proceedings of the law-making department to rest in parol or upon inference, but requires that "each house SHALL KEEP and publish weekly a journal of *its proceedings*," art. 36. That means not a *part* of its proceedings, but all of them; and what more solemn "proceeding" can a house take·than that of complying or dispensing with a provision of the constitution itself—a provision based upon a profound regard for the public weal? Unless this solemn "proceeding" appear affirmatively upon that record which each house "shall keep," it is an inevitable conclusion of law that the proceeding. never took place. Here the maxim applies in all its force, "*idem est non esse et non apparere.*" The record may, perhaps, upon proper allegations of fraud, etc., be impeached by parol, but it can never be supplied by parol, save in case of loss or destruction, nor can a fact of which written or record evidence is required be eked out by a presumption.

But it was not pretended even in argument, that the bill under consideration was read on three several days in the House of Representatives. It was not so read. But it is pretended that this provision of the constitution was dispensed with in that house by the requisite four-fifths, and that the journal shows it. This we deny.

The printed House journal (which, for this argument, we admit to be a correct copy of the original produced in court upon our call) shows that, on the fifth August, 1863, a quorum of only 52 out of 101 members being present at the opening (p. 96), Mr. Morey, of Ouachita, gave·notice (p. 100) of a bill under the name of "an act levying a special tax to provide for the payment of the past due interest on the bonds of the State, outstanding warrants, certificates of indebtedness, and Convention warrants." According to the routine which the House had prescribed for itself by its own rules, nothing more could have been done regarding this bill on that day. Their rule 43 (printed House Rules) requiring that "one day's notice, at least, shall be given of the intended motion·for leave to bring in a bill, unless *two-thirds* of the House allow otherwise, on motion to that effect." And rule 44 provided that "all bills before the House shall be taken up and acted on in the order in 'which they are numbered, and it shall be the duty of the chief clerk to number every bill in its regular order upon its first reading."

Here were two obstacles, in the House rules, to Mr. Morey's making any further progress with his tax bill on that fifth August, 1868. But one of the provisions of those rules (Rule 62) was, .that any of them could be "*suspended*" by a vote of "TWO-THIRDS *of the members present.*" The CONSTITUTIONAL provision, requiring three several readings "on three several days," formed no part of the eighty-two House Rules, not even being alluded to in any one of them. It sprung not from the members of the General Assembly, but from their masters. It towered immeasurably above them, and was unchangeable by them. It could not be dispensed with but by "*four-fifths* of *the House* where the bill was pending." Their own little rules they could amend, modify, suspend or abolish at their own sweet will, because they made them, and what they made they could destroy. But here was an over-mastering presence which could not be escaped by any subterfuge. It was not one of "the rules of the House" to be dashed aside by a simple vote of *two-thirds* of those present, but a *mandate of the Constitution* that created the House, stern, unbending and supreme, which could only be "dispensed with" by a special action or proceeding respecting itself alone, a proceeding to which "four-fifths of the house where the bill was pending," instead of "two-thirds of the members present," must give their concurrence.

This indispensable proceeding was never had; this concurrence was never given.

The inference that it *was*, can only be reached by bad grammar and

worse logic, by presumptions without evidence, and by arguments that must assume, what the court is forbidden to assume, that the houses composing the General Assembly are incompetent, by lack of intelligence, to do what the Constitution commands them to do, "keep a journal of their proceedings."

Let us now examine the entry upon which alone the Attorney General, and the counsel associated with him by the Government, rely. It is to be found on page 101 of the printed House Journal, in the entries for the same fifth August, 1868, the very day of the first "notice" of the bill:

"Mr. Morey, of Ouachita, under a suspension of the rules, offered the following bills, which passed their first and second readings, 150 copies of each ordered to be printed, and bills referred to the Committee on Ways and Means, as follows:

"House bill No. 10, an act to provide means necessary for the relief of the treasury of the State.

"House bill No. 11, an act levying a special tax to provide for the payment of the past due interest on the bonds of the State, outstanding warrants, certificates of indebtedness, and convention warrants."

According to grammatical construction, every school boy who has gone through the smallest treatise upon syntax can perceive that all that was done here, "under a suspension of the rules," was the introduction or "offering" of the bill. The collocation of the words, the punctuation, and the laws of composition in English, that noble language in which the legislative proceedings of the State are required by the Constitution, art. 109, to be promulgated and preserved, all point to this as an unavoidable conclusion. The inference is irresistible that the bills passed their first and second readings, were ordered to be printed, and were referred to the Committee on Ways and Means, without the suspension of any rules whatever, as to those distinct and subsequent "proceedings."

This view alone would seem decisive of the case.

But there is yet another. There were no "rules of the House" requiring suspension to pass the first and second readings, to order to print, or to refer to the Committee on Ways and Means. There were two rules of the House, one requiring the notice of at least one day previous to introduce a bill, and the other requiring the numbering it, and taking it up in its order, which needed suspension by two-thirds of those present before Mr. Morey could move a step in getting any action of the House on that day. This suspension, and this suspension alone, he seems to have sought and procured.

But "suspension of the rules" to offer a bill, of course meant nothing but suspension of "rules of the House." The Constitution is too elevated an instrument to be degraded to the level of and classed among "the rules of the House," or "the rules" simply. The basis of voting to *dispense with* the article 42 of the Constitution is a different basis of voting from that required to *suspend* "the rules," one demanding *four-fifths of the House*, and the other *two-thirds of the members present*. This *suspension of the rules*, and this *dispensation from a constitutional provision* cannot be lumped together, or tested by a single motion and vote. Each regulation stands upon its own distinct and separate footing, different in source, different in rank, different in sanction, different in manner of suspension, and different in result when not complied with. And so we find them treated even in this very Journal. At page 8, in the third day's proceedings, "Mr. McMillen, of Carroll, moved that the rule laid down in the 42d article of the Constitution, in regard to the consideration of bills and joint resolutions be dispensed with," in order to put a resolution on its passage. It is true, this was before the House Rules were adopted. But long afterwards, and after these proceedings upon Mr. Morey's tax bill, to wit, on the nineteenth of August, 1868—

the same Mr. Morey appears to have recognized the immense difference between "the rules" and *constitutional provisions.* For, we find him, on page 144 of the House Journal, thus figuring:

"Mr. Carr, of Orleans, moved that Senate bill No. 70 be taken up.

"Carried.

"On motion of Mr. Carr, of Orleans, the reading of the bill in detail was dispensed with.

"The bill was passed on its first reading.

"Mr. Morey of Ouachita, moved to suspend the CONSTITUTIONAL rules to place the bill on its second reading.

"Rules not suspended."

That "the rules" simply meant *the House rules* is illustrated also by the following entry, to be found at page 97 of the House Journal, upon the same fifth August, 1868:

"Mr. McVean, of Caddo, moved to suspend *the rules* in order to amend rule No. 34.

"Carried.

"And then offered the following resolution, which was adopted: Resolved, That rule 34, item 4, shall read seven members instead of five."

The constitution has nothing to do with this. "Each house of the General Assembly may determine the rules of its proceedings." Constitution, art. 35. But there was one solitary *House rule* in the way of Mr. Carr, the Rule 62, which provided that "no standing rule or order of the House shall be *rescinded* or *changed* without one day's notice being given of the motion thereof. Nor shall any rule be *suspended* except by a vote of two-thirds of the members present."

It is, therefore, so clear upon the record that the article 42 of the constitution was not dispensed with by any proceeding at all in the House, that it becomes unnecessary to refer to other irregularities in detail. Were it important, we might discuss the question whether the four-fifths required to dispense with article 42 means four-fifths of the *members* (who were hardly ever present during the session) or four-fifths of the *quorum* accidentally present at the moment; we might dwell upon the unaccountable change in the number of the bill from 11 to 111; we might expose the singular proceedings of the Senate, as they appear in the printed Senate Journal (page 164), full of eccentricities that are quite surprising in the action of so grave a body upon so grave a project. But, having already established our first point out of the journal of the *House,* we must hasten to another branch of the case.

This tax law directly contravenes article 110 of the Constitution of 1868, which declares that "no retroactive law shall be passed."

It was held by the Supreme Court of the United States, in the case of Rhode Island *v.* Massachusetts, 12 Peters 657, that, "in the construction of *the Constitution* we must look to the history of the times, and examine the state of things existing when it was framed and adopted, to ascertain the old law, the mischief and the remedy."

The Constitution of the United States (art. 1, sec. 10,) only prohibited a State from passing "any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts."

Here was no express prohibition of laws divesting vested rights, or of retrospective laws in general, *ex post facto* laws having a settled technical meaning restricting them to such as related to crimes and penalties only. And so the courts of the United States held that they had no power, under the Constitution of the United States, to declare a State law void simply because it divested vested rights, or because it was retrospective in its character. The leading case upon this subject is that of Satterlee *v.* Matthewson, 2 Peters 380. On page 413, the Supreme Court of the United States remarked: "If the effect of the statute in question be not to impair the obligation of either of those contracts, is there any other part of the Constitution of the United

States to which it is repugnant? *It is said to be retrospective.* Be it so; but retrospective laws which do not impair the obligation of contracts, or partake of 'the character of *ex post facto* laws, are not condemned or forbidden by any part of that instrument.    *    *    *    *    *
There is nothing in the Constitution of the United States which forbids the Legislature of a State to exercise judicial functions.    *    *    *
The objection, however, which was most pressed upon the court, **and** relied upon by the counsel for the plaintiff in error, was, that the effect of the act was to divest rights which were vested by law in Satterlee. There is certainly no part of the Constitution of the United States which applies to a State law of this description."

This case was followed in Watson *v.* Mercer, 8 Peters 110, where *ex post facto* laws were held to relate "only to penal and criminal proceedings which impose punishments or forfeitures, and not to civil proceedings which affect private rights retrospectively."

Again, in the great case of the Charles River Bridge *v.* the Warren Bridge, 11 Peters 539, it was said: "It is well settled by the decisions of this court, that a State law may be *retrospective in its character,* and may divest vested rights, and yet not violate the Constitution of the United States, unless it impairs the obligation of a contract." In this case the terms "retrospective" and "retroactive" were used interchangeably as synonymous. See also, to a similar effect, Bennett *v.* Boggs, 1 Baldwin 74; Balt. & Susq. R. R. Co. *v.* Nesbit, 10 Howard 401; Carpenter *v.* Penn, 17 Howard 456.

The Circuit Courts of the United States, sitting in different States, conform to the State constitutions in regard to this matter, holding retroactive laws to be valid in States where they are not constitutionally prohibited, and void where they are so prohibited.

Thus, in the Society for the Propagation of the Gospel *v.* Wheeler, 2 Gallison 139, Story J. held that a law of New Hampshire, relative to the recovery for their improvements by evicted tenants of real estate, was unconstitutional, null and void, because a clause in the bill of rights of the constitution of New Hampshire denounced certain retrospective laws, among which the Judge thought this law to be included.

But in Allen *v.* Bundy and May, 2 Paine's C. C. Rep. 76, the United States Circuit Court (Thompson, J.) enforced a statute of Vermont, precisely similar to that of New Hampshire, under similar circumstances, holding it to be valid because the constitution of Vermont, like that of the United States, was silent upon the subject of retrospective laws.

The language of the bill of rights in the New Hampshire constitution was this: "Article XXIII. Retrospective laws are highly injurious, oppressive and unjust. No such laws, therefore, should be made either for the decision of civil causes or the punishment of offenses." Under this provision, the Superior Court of Judicature of New Hampshire held, very properly, that "in order to bring a law within the constitutional prohibtion it must be a law *for the decision of a civil cause,* or for the *punishment* of an offense. All retrospective laws are not within the prohibition, notwithstanding the general terms of the *first part* of the article. They may be made for the *mitigation* of punishment." Clark *v.* Clark, 10 N. H. 388, referring to the instructive case of Woart *v.* Winnick, 3 N. H. 476.

In the case of Boston *v.* Cummins, 16 Georgia 113, the Supreme Court of that State (Lumpkin, J.) said: "But neither by the civil law, which is the basis of the different codes, to a greater or less extent, of all continental communities, nor by the English law, from which our system was more directly borrowed, and which is itself much more indebted to the civil law than the jurists of that country have ever been willing to acknowledge, has the right to pass retrospective acts ever been doubted. And it is a matter of discretion pretty much for the Legisla-

ture (under the restrictions of the fundamental compact) how far it may be expedient to enact laws of this description."

So in California, it was held by the Supreme Court of that State, in Von Schmidt v. Huntington, 1 California 65, that, "as a general rule of statutory interpretation, it is undoubtedly true that a statute should be construed to operate upon the future, and not upon the past; but, *with the exception of those cases which come within the purview of prohibitory clauses in State constitutions or in the Constitution of the United States,* we know of no case in which it is not competent for a State Legislature to give a statute a retroactive effect; and it is the very scope and object of the statue of twenty-eighth February to provide for the decision upon appeal of cases which had been tried previous to its passage." Because there was no clause in the constitution of California forbidding retroactive laws, that act was held valid.

In the constitution of Pennsylvania, also, there was no *express* prohibition against retroactive legislation. Yet, one of the ablest judges that ever sat in that State seems to have regretted that their courts had not taken a stand against it, as prohibited by implication. In Greenough v. Greenough, 11 Penn. State Rep. p. 495, Chief Justice Gibson said:

"All *ex post facto* laws are arbitrary; and it is to be regretted that the constitutional prohibition of them has been restricted to laws for *penalties and punishments.* In a moral or political aspect, an invasion of the right of property is as unjust as an invasion of the right of personal security. But retroactive legislation began, and has been continued, because the judiciary has thought itself too weak, because it has neither the patronage nor the *prestige* necessary to sustain it against the antagonism of the Legislature and the bar. Yet, had it taken its stand on the rampart of the Constitution *at the outset*, there is some little reason to think it might have held its ground."

Noble words, and full of warning as to the course proper to be pursued by the judiciary here, in this, the first case arising under a new constitutional provision in Louisiana!

On account of such experienced mischiefs, and of judicial lamentations like these over the absence of an express constitutional restraint upon retroactive legislation, some States in the Union previous to the change in Louisiana, had felt and acted upon the necessity of such a textual prohibition in their fundamental laws.

In Ohio, for instance, under the constitution of 1802, there was no such inhibition. And the Supreme Court of that State, in many cases, while recognizing the impropriety of such legislation in general, yet held that they had no power to supply the omission in their organic law, by construction. In 1851, a new constitution was there adopted, expressly prohibiting retrospective laws. While the Supreme Court of Ohio adhered to their old decisions as to laws passed under the old constitution, they expressed their satisfaction that all such legislation in future would be inoperative and void. In the Trustees of Cuyahoga Falls v. McCaughey, 2 Ohio (N. S.) 154, decided in 1853, they said: "We do not favor retrospective laws, *and think they were wisely prohibited by the new constitution*, but they were frequently sustained under the former constitution, and have also been sustained by the highest courts of other States and by the Supreme Court of the United States." And again, in Archeson v. Miller, 2 Ohio (N. S.) 207, they said: "But even if the statute had changed the law, we could not say that it came in conflict with the constitution *then in existence.* Retrospective laws of this kind have frequently been passed, and have been decided by our own as well as other courts to be valid, *in the absence of any specific constitutional prohibition.*"

And in Butler v. City of Toledo, 5 Ohio (N. S.) 225, it was held that a retroactive assessment, to complete a deficiency for paving streets,

*having been levied under the Constitution of* 1802, would stand, intimating that no such thing could take place under the new Constitution, which forbade retroactive laws.

Following the lead of the Supreme Court of the United States, which finding no clause in the United States Constitution inhibiting the States from passing retroactive laws *eo nomine*, decided therefore that the court could not supply such a prohibition by implication; the several State tribunals, where their *State* Constitutions contained no such express prohibition, declined to supply it.

And it was precisely upon this ground that the case of Municipality No. 1 *v.* Wheeler and Blake, 10 Ann. 745, was decided. "However repugnant to logic and sound policy they may be, retrospective laws, *in civil matters*, do not violate the Constitution, unless they tend to divest vested rights or to impair the obligation of contracts, neither of which can be predicated of the act in question."

By referring to the Louisiana Constitution of 1852, then in existence, it will be found that there was no prohibition against retroactive legislation, any more than there is in the Constitution of the United States. This decision of Wheeler and Blake's case was followed in Cordeviolle's case, 13 Ann. 268; Poutz' case, 14 Ann. 853, and Locke's case, in 14 Ann. 854, which last case was correctly affirmed by the Supreme Court of the United States upon writ of error, as reported in 4 Wallace 172.

But the oft repeated regrets of judges over their inability to prevent the obvious injustice of retrospective legislation generally, combined with the mischiefs consequent upon such legislation, at last produced their effect here in Louisiana, as they had already done in Ohio and some other States.

Indeed, it is probable that this very decision of Wheeler & Blake's case, and those decisions which followed in its wake, impelled the framers of the Constitution of 1864 to revise article 105 of the Constitution of 1852 by simply inserting the two words "or retroactive" after the words *ex post facto*, making the article 109 of the Constitution of 1864 to read thus: "No *ex post facto* or retroactive law, nor any law impairing the obligation of contracts, shall be passed, nor vested rights be divested, unless for purposes of public utility, and for adequate compensation previously made." This article is preserved *totidem verbis* in article 110 of the present Constitution of 1868, and this is the first case in which this important and controlling innovation upon the old Constitutions of 1812, 1845, and 1852 has been brought forward as the basis of judicial action. The change was obviously made to prevent the possibility of any more such decisions as the court was compelled to make in Wheeler & Blake's case. If this provision had existed in the Constitution of 1852, that case would certainly have been decided the other way by that bench unanimously. As it was, even without any constitutional prohibition, such is the odium of this species of legislation, that the court hesitated long over the case, and one of the judges (Mr. Justice Buchanan) dissented at last in a very earnest opinion.

That case was a most peculiar one in its features, and it was not tainted with the reproach of injustice that this is, as the court will perceive by reading the whole of the majority opinion.

All but that portion which held that retroactive legislation was not forbidden by the Constitution, was *obiter* simply, not even binding on the court that uttered it. Those remarks vindicating the law "from the odium of injustice" were occasioned by the dissent in the court, were not material to the judgment, and are not to be taken as essential doctrine of the case. The law passed upon there was "not strictly retrospective," because it was remedial merely; the tax then in question had been prospectively laid and almost all of it collected and expended, so that the effect of disturbing it would lead to great inequality and injustice.

The short opinion of Mr. Justice Field, in Locke *v.* New Orleans, 4 Wallace, 172, was evidently based upon the majority opinion in Wheeler & Blake's case, 10 Annual, although the latter case is not alluded to. An *obiter* expression is quoted from it almost verbatim, but so separated from the explanatory remarks which followed as to convey an erroneous opinion of its meaning. The question whether the law was retrospective or not was not before the Supreme Court of the United States at all, as the only point that court could review by writ of error to a State court was, whether the Constitution of the United States was infringed, and it was correctly held that it was not, because that instrument did not forbid retroactive laws at all.

If the Legislature can tax upon an assessment made the year previous and with a view to the taxes of that year, it can do so upon an assessment of two years previous; upon one of three years; upon one of four years; upon one of ten years ago; that is, upon an *ante bellum* assessment, including slaves! Who shall draw the line? The Constitution draws it clearly and unmistakably. You shall not retroact at all. Your legislation levying taxes and providing assessments according to which taxes shall be distributed, like all other legislation, shall be *prospective* only. You shall so act in imposing *future* taxes, which alone you have power to impose, as to provide a just measure of the value of every tax-payer's property for the year in which that tax is to be laid. If you depart from this plain rule, all must be left to the wild caprice, and greed, and passion, and savagery of party domination, and the boasted Constitution is indeed "a parchment lie."

By virtue of the change in our State Constitution expressly inhibiting, for the future, *all retroactive laws,* the doctrine announced as the true one, on principle, in Michoud's case, 6 Ann. 610, has become a constitutional and imperative doctrine, which cannot now be violated by the Legislature without affecting their acts with absolute nullity. "The power to lay and collect taxes has ever been understood to operate prospectively; and never retrospectively, as contended. If the council could legally tax for a year back, we see no reason to prevent them from doing so for any numbers of year. Such has never been the interpretation of a power to lay and collect taxes either by the Legislature or political corporations acting under its authority."

The law in question comes precisely within the definition of Worcester: RETROACTIVE, "Acting backward, or *upon something past or preceding.*"

The last question presented by our injunction is, whether the Act No. 114 (Sess. Acts 1868) does not infringe that clause of the Constitution in article 118, which declares: "Taxation shall be equal and uniform throughout the State; all property shall be taxed in proportion to its value, to be ascertained as directed by law."

Our remarks under this head will further illustrate and strengthen our previous position, that the tax law in question is retroactive in its character; and the interdict against retroactive laws in the new Constitution also powerfully reinforces this our third position.

Property is essentially inconstant in value. It fluctuates from year to year. Some descriptions of property are rising in value, while others are falling. Notably has this been the case during the past few years, marked as they have been by the most sudden and extraordinary convulsions, civil and political. Sugar plantations this year are often appraised at more than twice the valuation of 1867, while cotton lands in many parts of the State, have scarcely risen at all. Some persons have made fortunes in the last year, while others have lost them.

Not only does property fluctuate in value, but it is constantly passing from hand to hand. No man's estate is in precisely the same condition as to its elements and valuation in 1868 that it was in 1867. And these changes of ownership and estimation are so great, from last year to this as

to make it impossible for a tax levied on the twenty-ninth day of September of the year 1868, to operate equally, uniformly and in proportion to value throughout the State, by levying it at a rate of one per cent. upon an assessment made in the spring and summer of the year 1867. In the first place, each tax payer was assessed in the year 1867 only upon the property he then owned. Many persons then owning property parted with it entirely before the assessment for 1868 was begun or this tax thought of. Many who owned no property when the assessment of 1867 was made, have acquired large estates since then, and before the new tax was levied. Large numbers of speculators have been buying up property in this State since the assessment of 1867. These last will escape any taxation at all under the retroactive law in question, while those who have lost all or part of the property assessed as theirs in 1867 will have to pay now a tax of 1868 upon property they ceased to own before the dawn of the year 1868, and long before the tax was imposed. Numerous individuals who were assessed in 1867 on lands and houses then standing in their names, but encumbered with mortgages and other liabilities, were obliged to suffer those lands and houses to be sold before the tax of the twenty-ninth September, 1868, was ever dreamed of; and yet, if the law be valid, they must be held bound to pay this new tax, while those who acquired the same estates, perhaps at forced sales, even before the year 1868, will escape scot free ! Is this the equality and uniformity demanded by the Constitution ? Is this prospective, and not retroactive legislation, which produces such results ? Or is it not rather the most unequal, retrospective, odious and unconstitutional system of taxation that the wit of man could invent ?

It may be said that these changes in ownership and valuation are going on all the time, and so that no assessment whatever will be altogether fair, even if made after the tax be levied. To a certain extent, the remark is just. *Absolute* equality and uniformity are unattainable, and Judges do not sit to enforce Utopian or impracticable theories.

But it is the duty of Judges to compel the Legislature to conform, as closely as *is* practicable, to the positive injunctions of that Constitution which is the measure of its authority and the sole source of its power. And it *is* practicable, and most reasonable and proper besides, that an assessment of property should follow the act levying the tax, or at least *immediately* precede its attempted collection. It is feasible, just and positively necessary, that the tax and the assessment, which is the basis of the tax, should be contemporaneous, that is, *in the same year*. The taxes of 1867 and the assessment of 1867 should go together; the taxes of 1868 and the assessment of 1868 cannot be constitutionally divorced. It is not true that when this special one per cent. tax of September 29, 1868, was ready for collection, the assessment of 1867 was the "last assessment." The assessment of 1868 had been made and completed, if the assessors did their legal duty, before a single demand was made of any tax payer for this extraordinary tax. If it had not been quite completed when the law was approved, it was equally the duty of the Legislature levying a tax in September, 1868, to levy it according to that assessment of 1868 (which had begun in the spring, continued through the summer, and was then nearly, if not quite completed), so soon as it should be completed, or it was their duty to order a new assessment with direct reference to this "special tax." They had no more constitutional power to refer the basis of this tax back to the assessment of 1867 than they had to that of 1860.

If we once depart from the simple and obvious rule that taxes and assessment should be contemporaneous, or that the assessment should follow the levy and precede the collection of each tax, where shall we stop ? What is the gauge by which the court can determine that an act levying a tax upon an assessment roll over a year is valid, while one levying it on an assessment roll ten years old is invalid ? Each year

must bear its own burdens, and not those of others. The assessment of 1867 was made for the taxes of 1867 alone, and has nothing to do with those of 1868. The taxes of the year 1867 cannot be levied in the year 1868. The assessment of 1867 cannot form any just criterion for making a tax laid late in 1868 equal and uniform, and proportionate to the value of all taxable property throughout the State. As a more just criterion could obviously be had in the assessment of 1868, or even a special new assessment, the court will not hesitate to condemn such a violation of constitutional requirements in the exercise of the taxing power.

Those views are fortified by the concluding phrase of the second clause in the article under discussion: "*All property shall be taxed in proportion to its value, to be ascertained as directed by law.*" Here is no provision for taxing property according to a value that it may have had at some bygone time; but a direction that it *shall be* taxed according to its *value*, which would naturally mean according to its value *at the date of the levy of the tax*, or at the very least, according to its value *in that year;* and this view is confirmed by the expressions, "*to be* ascertained," implying a *future* assessment, and "as directed by law," not by a retroactive law, for the same Constitution expressly forbids such a law, but by a law that shall be prospective in its operation, or at least based upon contemporaneous proceedings.

For these reasons, we submit that it is not now competent for the law-makers of Louisiana to tax backwards, or to assess backwards. The supreme law forbids it, and forbids this special tax act as it now stands, in terms too plain to be mistaken, evaded, or disobeyed.

---

## ARGUMENT FOR THE STATE.

This case involves the constitutionality of the act of the Legislature of Louisiana, approved twenty-ninth of September, 1868, entitled "An act levying a special tax to provide for the payment of the past due interest on the bonds of the State, outstanding warrants, certificates of indebtedness and Convention warrants." Plaintiff, who is a tax payer, obtained an injunction against the defendant, a State tax collector, restraining him from collecting the amount levied upon plaintiff by the statute aforesaid. The injunction was made perpetual by the court below, upon the ground that the law in question is unconstitutional. From this judgment the State of Louisiana—the real defendant—has appealed. This cause involves the decision of a number of other cases still pending in the courts below.

The case at bar suggests the consideration of two general principles of constitutional law:

*First*—What limit is there to the power of the Legislature to levy and collect taxes?

*Second*—How far will this tribunal go in declaring a law enacted and duly promulgated, to be unconstitutional and void?

The power of taxation is inherent in all governments. It has no limit but in the will of the sovereign power. In an unlimited monarchy the king may tax, may even confiscate. In a republic, where the people are sovereign, they vest in their governmental agents that inherent sovereign power of taxation, limited only by their expressed and unquestionable will, which can be found nowhere but in the constitution of the State. "The power of taxing the people and their property," says Chief Justice Marshall, "is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable to the utmost extent to which the government may choose to carry it. The only security against the abuse

is found in the structure of the government itself. In imposing a tax the Legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation."

"The people of a State, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representatives to guard them against its abuse." McCulloch v. the State of Maryland, 4 Wheaton, p. 428. A late writer upon constitutional limitations, says, "The authority to impose taxes is one so unlimited in form and so searching in extent, that the courts scarcely venture to declare that it is subject to any restriction whatever, except such as rests in the discretion of the authority that exercises it. It reaches to every trade and occupation; to every object of industry, use and enjoyment; to every species of possession; and it imposes a burden which, in case of failure to discharge it, may be followed by seizure and sale or confiscation of property. No attribute of sovereignty is more prevading and at no point does the power of the government affect more constantly and intimately all the relations of life than through this power." Cooley's Constitutional Limitations, page 479.

"Taxes are defined to be burdens or charges imposed by the legislative power of a State upon persons or property to raise money for public purposes." Blackwell's Tax Titles, 1864, p. 1.

Alexander Hamilton says:

"The conclusion is that there must be interwoven in the frame of the government a general power of taxation in one shape or another.

" Money is, with propriety, considered the vital principle of the body politic, as that which sustains its life and motion, and enables it to perform its most essential function.

" A complete power, therefore, to procure a regular and adequate supply of revenue, as far as the resources of the community will permit, may be regarded as an indispensable ingredient in every constitution.

"From a deficiency in this particular, one of two evils must ensue: either the people must be subjected to continual plunder, as a substitute for a more eligible mode of supplying the public wants, or the government must sink into a fatal atrophy, and in a short course of time, perish." The Federalist, No. 30, p. 142, original edition.

And again, the same enlightened statesman says:

"It conducts us to this palpable truth, that a power to lay and collect taxes, must be a power to pass all laws *necessary* and *proper* to call it into effect." The Federalist, No. 33.

In the year 1868, the government of our State was in dire need of funds. Previous Legislatures had refused to enforce the collection of back taxes, but had not scruples to contract a vast floating debt to leave as a legacy to the present government. There was no money to pay the current expenses, and the bonds of the State were gradually becoming as worthless as the Continental currency after the Revolution, for want of payment of their coupons. The Legislature acted promptly, yet with no undue haste. The law whose constitutionality is now questioned was passed—an act demanded by the exigencies of the moment, and framed with regard to the best interests of the State. This court is now asked to annul this law for some fancied violation of the constitution.

We are told that Legislatures are "creations of the Constitution; they owe their existence to the Constitution; they derive their power from the Constitution;" that "if a legislative act oppugns a constitutional principle the former must give way and be rejected on score of repugnance," and that "in such case it will be the duty of the court to

Henry Frellsen v. F. C. Mahan, Tax Collector.

adhere to the Constitution and to declare the act null and void." Plaintiff's brief, pp. 3 and 4. These axioms are unquestioned.

But "the Constitution should be liberally construed in upholding the constitutionality of statutes." The People v. Board of Supervisors of Orange, 27 Barbour N. Y., p. 575.

"The sovereign law-making power of the State is entitled to at least as strong a presumption in favor of the validity of its acts as a criminal on trial in favor of his innocence." Ib. See Cochran v. Van Surley, 20 Wendell 365; People v. Fisher, 24 Wendell 215.

"If an act of Congress admits of two interpretations, one of which brings it within, and the other presses it beyond, their constitutional authority, the judiciary will adopt the former construction, because a presumption ought never to be indulged that Congress meant to exercise or usurp any unconstitutional authority, unless that conclusion is forced upon the court by language altogether unambiguous." United States v. Combs, 12 Peters 72.

This same principle applies to the legislation of the several States.

"The Supreme Court," it has been held by this court, "as the guardian of the constitutional rights of the people, is authorized to pronounce on the constitutionality of the acts of the two other departments of government; but no act of either will be pronounced unconstitutional unless manifestly so, and the incompatibility with the constitution must be evident." 3 M. 12 and 553; 3 N. S. 472; 4 N. S. 138; 5 R. 333; 8 An. 341.

This court recently reaffirmed this doctrine in the case of the State v. Volkman.

From these authorities it clearly results that the power of the Legislature to lay and collect taxes is only limited by the Constitution, and that the court will always presume that the statute is not violative of constitutional provisions, and will refuse to annul a legislative act unless its conflict with the fundamental law is manifest beyond doubt.

It is maintained by the plaintiff in injunction that the act of September 29, 1868, is unconstitutional.

*First.*—Because it was not passed with the formalities prescribed by article 42 of the Constitution.

*Second.*—Because it is retroactive.

*Third.*—Because the tax is not equal and uniform.

In proceeding to consider the first objection to the Act No. 114, viz: that it was not passed with the forms and solemnities required by the Constitution of Louisiana of 1868, we are met at the threshold with the important question as to whether this Court will feel itself authorized to go back of an enrolled and duly authenticated and promulgated statute, to examine the journals of the Legislature in order to ascertain if the law was properly passed. The decisions throughout the Union establish the doctrine that courts cannot take judicial notice of the journals of the Legislature in order to impeach a statute upon grounds of informality in its passage.

By the common law, the acts of Parliament import absolute verity. Comyn Dig. Title Parliament. There is no common law in this country conflicting with this principle, nor does the Federal Constitution in any way change the rule of the common law. Laws of Congress require no proof, and they are considered of such authority that no evidence is allowed to contradict them. All statutes of Louisiana are signed by the Speaker of the House of Representatives, and by the President of the Senate, and by the Governor, unless vetoed. They are then required to be kept by the Secretary of State. Articles 66 and 68, Constitution 1868. When an act has been passed, thus signed, deposited and recorded, it has absolute authenticity and validity. But it is said by plaintiff's counsel—Brief, p. 9.—that the Constitution requires that "each house shall keep and publish weekly a journal of its proceedings;" and they suggest that these are intended to remain as proof of

the proper or improper enactment of a statute. But the journals are nowhere made evidence for any purpose. The object of requiring the houses to keep a journal, is stated by Judge Story to be, "To ensure publicity to the proceedings of the Legislature, and a corresponding responsibility of the members to their respective constituents." 2 Story Comm. on Const., § 838. And not to furnish evidence by which the passage of the acts of the Legislature may be called into question, and the acts themselves nullified.

This question was reviewed and decided by the Supreme Court of Mississippi in 1856, in the case of Green v. Weller *et al.* 32 Mississippi Rep. p. 650. The court said: "The record of a public act of the Legislature of this State is the enrolled bill, clothed with the solemnities required by the Constitution, and filed in the office of the Secretary of State. The signatures of the presiding officers of the two houses, and of the Governor, is required in attestation, that the bill was passed in due form. This implies the power to determine whether the act has been passed in conformity to the requisites of the Constitution, and a memorial of it is required to be made in order that it may stand as a record of the authenticity and validity of the act. No other record of the act is required to be kept, and of necessity it must have been intended that the act so sanctioned and required to be preserved, shall constitute a record, with the incidents appertaining to such a record at common law, importing absolute verity, which no evidence is allowed to contradict, and a compliance with the forms necessary to its validity, It stands upon the same footing as the record of a court of justice. and every matter adjudicated becomes a part of the record which thenceforth proves itself without referring to the evidence on which it has been adjudged. * * * And the facts implied by such a record could no more be contradicted, than could it be shown that a judgment of this court, which appeared by the record to be rendered by the whole court, was, in truth, rendered by but one member of the court, or that a formal judgment of an inferior court was rendered without evidence." 32 Miss. Rep. p. 650.

In the case of the Pacific Railroad v. the Governor, 23 Missouri Reports, p. 353, the Supreme Court of that State decided that the validity of an enrolled statute, duly authenticated, could not be impeached by the journals showing a departure from the forms prescribed by the Constitution. The organ of the court in that case—a case in which this question was ably and fully discussed and reviewed—used the following remarkable language: "When we reflect on the manner in which the journals are made up, and the rank of the officers to which that duty is entrusted, how startling must the proposition be that all our statute laws depend for their validity on the journals of the two houses of the General Assembly, showing that all the forms required by the Constitution to be observed in the enactment have been complied with. The required forms may be observed and the clerks may fail to make the necessary or correct entry. If the journals had been designed as the evidence in the last resort, that the laws were constitutionally passed, would not some method have been adopted by which greater care would have been exacted in entering the proceedings of the two houses? Would the task of making them have been entrusted to a single clerk, with the power in the houses to dispense with their reading even should there be a rule requiring them to be read—a matter, however, about which the Constitution and laws are silent?" 23 Mo. 353.

A clause in the Constitution of New York requires the assent of two-thirds of the members elected to each branch of the Legislature to pass a certain class of laws. A statute of the State provides that no such law shall be deemed to have so passed unless it affirmatively appear to have been so passed upon the enrolled bill by certificate of the presid-

ing officers; thus clearly showing that the journals were not of sufficient authority to establish such an important fact. It was under this provision that the case of the People v Purdy, 2 Hill 31, relied on by the counsel for plaintiffs—and other cases, arose in the State. It was held that the court might inspect the the enrolled bill in the office of the Secretary of State. The Supreme Court of Missouri, in the case already cited, carefully reviewed these cases, and held that they had no bearing upon the issue now made. They stated: "In our investigation we have not met with a single case in which the courts have looked behind the statute roll in order to determine whether in passing a law, the members of the Legislature conformed their conduct to the rules directed by the Constitution to be observed in framing laws." Pacific Railroad Company v. Governor, 23 Mo. 353.

But the case of The People v. Devlin, decided in 1865 by the Court of Appeals of the State of New York, 6 Tiffany 33 N. Y. Rep. p. 269, completely overthrows the authority of the Purdy case, if it ever had any application to the question now before this court, and finally puts at rest this disputed question. "I am of opinion," says the court, "that the legislative journals were not legitimate evidence to impeach the statute produced. They are not made evidence by the Constitution; they are not made so by the statute; they were never made so at common law."

But if the court should deem itself authorized to look further than the law itself to ascertain whether the provisions of article 42 of the Constitution were complied with in the passage of the law No. 114, then it will be found that the journals of the House disclose no informality in its enactment, but show affirmatively that the requirements of the constitution were observed.

It will not be denied that this article 42 is intended, and only intended to guard against hasty legislation. Let us trace this law in its passage through the two houses, and it will be seen that it was enacted in accordance with the spirit of that constitutional safeguard, and only after the most ample consideration and free discussion.

On the thirty-fourth day of the session, August 5, Mr. Morey, of Ouachita, offered in the house two bills, under a suspension of the rules, which passed their first and second readings, 150 copies ordered to be printed, and both were referred to the Committee on Ways and Means. The first of these was House bill 110—erroneously printed House bill No. 10—"An Act to provide means necessary to the relief of the State." The second was House bill 111—erroneously printed No. 11—"An Act levying a special tax to provide for the payment of the past due interest on the bonds of the State, outstanding warrants, certificates of indebtedness, and Convention warrants." See House journal, p. 101.

On the forty-third day of the session, August 17, the Committee on Ways and Means reported on House bill No. 111, and recommended that House bill No. 106 be adopted as a substitute. The House then agreed to consider the bill in Committee of the Whole. House journal, p. 130.

On the forty-fourth day, August 18, the House considered the bill 111 in connection with five other proposed finance bills. "After a lengthy debate," the committee rose, reported progress, and asked leave to sit again. House journal, p. 136.

On the forty-eighth day of the session, August 23, the Committee of the Whole again considered the bill in same connection, rose and reported progress. House journal, p. 153.

On the fifty-third day, August 28, the bill was once more considered in Committee of the Whole, when, in the language of the journal, "After a protracted and lengthy discussion, the committee rose," and reported progress. House journal, p. 174.

On the fifty-fourth day, August 29, the Committee of the Whole again "discussed the merits of the bill, rose, and through its chairman

recommended its passage." An attempt was then made to suspend the rules, which failed. Journal, p. 178.

On the fifty-sixth day, September 1, the bill passed its third reading. House journal, p. 184.

It will be thus seen that in the House the bill was pending for twenty-two days, and was discussed, in Committee of the Whole, upon four different days.

The bill reached the Senate on the fifty-sixth day of the session of the Senate, September 2. Senate journal, p. 148.

On the fifty-seventh day—September 3—the bill came up on its first reading, and under a suspension of the rules passed its second reading and referred to the Committee on Finance. Senate journal, p. 149.

On the fifty-ninth day—September 5—the committee reported favorably. Senate journal, page 154.

On the sixty-second day—September 9—the rules were suspended and the bill taken up out of its order, section by section, and finally adopted under a suspension of the rules. Senate journal, pages 164 and 165.

On the sixty-fourth day of the House session—September 10—the bill was returned from the Senate with an amendment. House journal, p. 209.

On the sixty-seventh day, September 15, the bill came up on the consideration of the amendment, and action postponed until Wednesday. This was Monday. House journal, p. 215.

On the sixty-ninth day, September 17, the bill was taken up with the amendment; the House refused to concur, and a notice was ordered to be sent to the Senate. House journal, p. 221.

On the sixty-ninth day of the Senate session, September 17, the Senate was notified of the refusal of the House to concur. Senate journal, p. 181.

On the same day the Senate receded from its amendment, and the bill became a law subject to the approval of the Governor, which was obtained on the twenty-ninth day of September, just fifty-four days after its introduction in the House.

It was contended in the court below that the constitutional rule required a bill to be read three several days, unless four-fifths of the house in which the bill is pending, suspend the rule, and that this provision contemplated the action of *four-fifths of all the members elected*. It is presumed that this interpretation will not be seriously insisted upon in this court. The same article No. 42, reads: "No bill shall have the force of law until on three several days, it be read in each house of the General Assembly." Certainly a house qualified to hear the bill read is a quorum. It is impossible reasonably to give the word two different significations in the same clause. The Senate of the United States, seventh July, 1856, decided that two-thirds of a quorum only were requisite to pass a bill over the President's veto, and not two-thirds of the whole Senate. 9 Law Reports quoted by Paschal, p. 93; see Cushing's Law of Legislative Assemblies, § 2387; Story on the Constitution, § 891; 1 Kent 249, note 6. The question came up in the Senate of Louisiana in 1846, as to what was meant by two-thirds of the Senate. It was decided without division to mean two-thirds of the members present. See journal of 1846–47, p. 40. The rules adopted by that body have remained with few changes until this day. The present rules specifically declare that four-fifths of the members present may direct the passage of a bill through more than one reading the same day. Senate Rule 33, 1868. It has been the interpretation of the House of Representatives of the Legislature of Louisiana. See House journal 1850, pp. 155 and 166.

But this question is not without judicial authority. In the case of Green *v.* Weller, 32 Miss., before cited, the point was clearly presented

Henry Frellsen v. F. C. Mahan, Tax Collector.

and decided. The act in question in that case was a statute proposing an amendment to the constitution of the State. It was held that when the constitution provided that such a bill should be passed by two-thirds of each house, the bill could be passed by two-thirds of a duly constituted quorum. 32 Miss. p. 682.

But it is contended that the entry on page 101 of the House journal, which states that "Mr. Morey, of Ouachita, under a suspension of the rules, offered the following bills, which passed their first and second readings, 150 copies of each ordered to be printed, and bills referred to the Committee on Ways and Means" does not, "according to grammatical construction," show that the Constitutional rule was dispensed with.

It is not urged by the counsel for the plaintiffs that there was any other informality than that alleged to have occurred on the day when the bill was introduced by Mr. Morey, as just stated.

Notwithstanding the hypercritical comments of the counsel on the other side upon the grammatical construction, punctuation and composition of this clause of the journal, it is clear from the whole paragraph, and the correlation of its members, that the House intended to suspend all the rules that it was necessary to suspend, in order to do what it did, i. e., get the bill before the House and pass it through its first and second readings. The counsel contend that the only thing that was done here under a suspension of the rules, was the introduction or offering of the bill.

In order to offer a bill, it was necessary to suspend *only one* rule—rule 43, of the House, which says: "One day's notice at least shall be given of an intended motion to bring in a bill, unless two-thirds of the House allow otherwise on motion to that effect." It was not necessary to suspend the forty-fourth rule of the House, which says: "All bills *before the House* shall be taken up and acted on in the order in which they are numbered; and it shall be the duty of the chief clerk to number every bill in its regular order *upon its first reading.*" Now, a bill cannot be *before the House* until after it is offered; and it cannot be numbered until it is before the House, for the clerk is not to number it, until it is put upon its first reading. The journal says that Mr. Morey moved "a suspension of the *rules*," not *rule*, in the singular (as it would have been had he desired *merely to offer* the bill) but *rules*, in the plural. The suspension of these rules was had in order that the bill might be passed through the first and second readings and be referred.

To do this, it was necessary to suspend not only House rule 43 by a two-thirds vote, but also to suspend the constitutional rule, article 42, by a fourth-fifths vote. As the record does not show that there was any opposition to the suspension of the rules, it is but fair to presume that the vote was unanimous; at all events no evidence *aliunde* has been offered to show that there was less than a four-fifths vote.

The clerk of this House, it seems by glancing through the journal, had a formula for recording the thing done at this time, viz: the presentation of a bill without previous notice, and the passage of it to a second reading in order to get it before a committee to be considered and reported upon. Thus, on page 25, we read, "under a suspension of the rules, the following bill, offered by Mr. Carr, of Orleans, went through its first and second readings and was referred to the Committee on Education;" and so on pages 52, 53, 108, 144, and 148 we find like entries. Now, to say that these bills did not pass their first and second readings, is to strike with nullity nearly every measure adopted by the Legislature, and charge the House with trifling. These minutes were approved, and the bills so introduced and passed to their third reading were subsequently acted upon accordingly. A plea of bad grammar will hardly vitiate laws so enacted. We must conclude that that was

done which was evidently to be done, and which a fair interpretation of the minutes disclose was done.

The objection that the act No. 114 is retrospective is unfounded. It does not partake of the characteristics of a retrospective statute in the constitutional sense .in which the word is used, nor even is it retroactive in the ordinary meaning of the term.

The counsel for plaintiffs, in their brief, have cited an incontrovertible array of authorities to establish the doctrine that, when there is no constitutional inhibition, the Legislature may pass retrospective laws; but that they cannot do so if prohibited by the Constitution. They have not, however, referred to the decision of a single court, nor to the language of even one elementary writer to sustain the allegation that a statute levying a tax based upon the last and only extant assessment roll of the State is open to the objection of being retrospective. We have nothing to do with the wisdom of prohibiting the passage of retrospective laws; they are unconstitutional, null and void, and our only inquiry is to know whether the statute in question is such a law.

All laws that "look backwards" or " act backwards" are not retrospective within the meaning of the Constitution. Such an interpretation would annul every statute relating to a condition of facts existing prior to its passage. A retrospective law is something more. "Laws are deemed retrospective, and within the constitutional prohibition, which by retrospective operation, destroy or impair vested rights, or rights to do certain actions, or possess certain things, according to the laws of the land." De Cordova v. The City of Galveston, 4 Texas, 479. Chancellor Kent, in the case of Dash v. Van Kleeck, 7 Johnson's Reports 477, in considering retrospective laws, speaks of them as laws impairing previously acquired civil rights. The Tennessee Constitution prohibits retrospective legislation. In the case of Townsend v. Townsend and others, reported in 1 Peck's Tenn. Reports, p. 1, the Supreme Court of that State says: "We have viewed with earnest attention the Bill of Rights, section 20, and have considered the inconveniences which any one interpretation will produce, and have finally settled down in this opinion, that the word retrospective, as in the North Carolina and Maryland Constitutions it is followed by *explanatory words*, so here it is explained by the words which immediately follow: "or law impairing the obligation of contracts," and that the whole clause, and both sentences taken together mean, that no retrospective law which impairs the obligation of contracts, nor any other law which impairs their obligation, shall be made, the latter words relating equally to both the preceding substances, and therefore that the term *retrospective* alone, without the explanatory words, can have no influence in this discussion." Peck's Tenn. Rep., p. 16.

We gather from these authorities, as well as from those cited in plaintiff's brief and the written opinion of the judge below, that the term *retrospective*, as used in article 110 of the Constitution, has a very restrained meaning.

A law may "retrospect" and "retroact" ever so much and it will not be unconstitutional unless it interferes with some civil right arising out of past transactions.

1 Kent Com. 455 and 456—note, authorities cited; 11 Peters, 539 and 540; 1 Peck's Tenn. Rep., 17; 2 Peters, 413; 8 Peters, 110; 7 Johnson, 455—*et seq.*, citing Puffendorff Droit de la Nat. L. 1 C. 6, sec. 6; also, 1 Bay. S. C. R., 170; 3 Dall., 386; 3 Story, Com. Const., 266; Eastman's Dig. Maine Reports, 161, and cases cited; Wonet v. Winnick, 3 N. H. 481; Clark v. Clark, 10 N. H. 386; 1 How. Miss. R. 183; 1 Engl. Ark. R. 491.

But it is abundantly established by an unbroken series of decisions, both in this State and in our sister States, that laws which impose

taxes upon assessments, made prior to the passage of such laws, are in no sense retroactive.

In the case of the Police Jury of St. Mary *v.* Harris, "the action was based upon an ordinance of the police jury of the parish, passed in the month of October, 1852, by which a tax of three per cent. was levied on the landed estate, as expressed [assessed] in the tax roll of the year, 1851." One objection "to the payment of this tax in the answer and urged in argument," was, that "the assessment ought not to have been made upon the tax roll of 1851." It is thus disposed of by the court: "On the second point, viz: that the assessment was illegal because the tax roll of the year 1851 was taken as the basis of the same, it may be observed that there is nothing in the record to show that the assessment roll of the year 1852 had been completed. In the absence of any allegation and proof to the contrary, it is but fair to presume that the police jury took the last assessment roll as the one upon which to levy the tax." St. Mary *v.* Harris, 10 Ann. 677, 678.

In the case of Municipality No. 1 *v.* Wheeler & Blake, the defendants were sued for a tax on an assessed capital of $20,000 for the year 1849, imposed by an ordinance of the municipality, approved nineteenth March, 1851. On the seventh of February, 1850, the Legislature passed a law empowering the municipalities of New Orleans to levy taxes on capital on the assessment rolls of 1848 and 1849. The defendants contended that the act of 1850, as well as the ordinance in pursuance thereof, was unconstitutional and void. The court said: "The statute is said to be unconstitutional, because it is retroactive in its operation. It is not an *ex post facto* law, as it has no relation to crimes and penalties. Article 8, of the Civil Code, which is the creature of the legislative power, cannot control the power that created it. However repugnant to logic and sound policy they may be, retrospective laws in civil matters do not violate the constitution, unless they tend to divest vested rights, or to impair the obligation of contracts. \* \* *But the law under consideration does not seem to be obnoxious to severe censure. It is not, strickly speaking, a retrospective law. It authorizes the future imposition and collection of a tax according to a past assessment.' This was within the legislative power. \* \* \* The act does not involve the exercise of a judicial function. It provides for the passage of a new ordinance. The point ruled in the case of Municipality No. 3 v. Michoud, 6 Ann. 605, has no application to the present case. The municipality, there, attempted without any legislative authorization, to revive back taxes which had been re-mitted,* 1 *Municipality v. Wheeler,* 10 *Ann.* 746.

In the case of the city of New Orleans *v.* Cordeviolle & Lacroix, the defendants were sued for taxes imposed under the same law and ordinance reviewed by the Supreme Court in the case of Wheeler & Blake. The counsel for the defendants was the judge *a quo* in this case. But the court said : "This case is identical with that of Municipality No. 1 *v.* Wheeler & Blake. The constitutionality and legality of the law and ordinance imposing the tax were fully discussed and determined in that case." 13 Ann. 268.

In the case of New Orleans *v.* P. D. Ponte, the Supreme Court was called upon again to review the decision in the case of Wheeler & Blake, and said: "In the case of the city of New Orleans *v.* Cordeviolle & Lacroix, 13 Ann. 268, the same point was decided in the same way, the Court observing that the constitutionality and legality of the law and ordinance imposing the tax in question, had been fully discussed in the previous case of Municipality No. 1 *v.* Wheeler & Blake." And the Court proceeded to add, with evident symptoms of impatience: "This is the *fourth time* that we are called upon to determine the point of the legality and constitutionality of *what is termed the retroactive taxation* by the city of New Orleans, under the provisions of the act of

13

February, 1850. The doctrine of *stare desisis* finds in this instance its applicability." 14 Ann. 853.

Once more, in the case of the City of New Orleans *v.* Samuel Locke, one of the counsel for the plaintiffs in this suit was of counsel for Mr. Locke, and urged, with other defense, the same objections to the statute which had been so often before rejected by the court, and they were supported in an argument of great length, carefully prepared. There was judgment, however, in favor of the plaintiff, affirming the decision in the case of Poutz, 14 Ann. 854.

But the defendant was still dissatisfied with the decision of our courts upon this point, and by writ of error, carried the case to Washington. There the Supreme Court of the United States fully adopted the decision of our State Supreme Court, and, noticing the defense relied on, say: "There was nothing in the position taken which entitled it to consideration. In the first place, *the act was not subject to the imputation of being retrospective. It did not operate upon the past or deprive the party of any vested rights. It simply authorized the imposition of a tax according to a previous assessment.* In the second place, even if the law had been strictly retrospective, it would not have been within the constitutional inhibition." Locke *v.* New Orleans, 4 Wallace 173.

Surely these decisions of the Supreme Court of the State of Louisiana thus distinctly and unequivocally sustained by the Supreme Court of the United States, constitute a barrier of legal authority against the plaintiffs, which this court would be very slow to overleap.. They establish that a tax, imposed according to a previous assessment, is not retrospective.

But this principle of law, so manifestly consonant to reason, does not rest upon the support of merely these authorities.

The same doctrine has been adhered to in repeated decisions of our own State, sustaining other taxes levied like this upon anterior assessment rolls.

In the case of the City of New Orleans *v.* The Southern Bank, suit was brought to recover of the defendants a tax assessed upon the capital of the corporation. The statute of twentieth March, 1856, clearly authorized the assessment of taxes upon the capital of the bank. The city did not avail itself of this right of taxation, however, until the twenty-third February, 1857, when an ordinance was passed levying a tax "on the tableau of assessment made by the State Assessors for the year 1856." On the nineteenth March, 1857, the Legislature exempted from municipal taxation all capital employed in free banking from and after that date. The collection of the tax sued for was resisted with much ability and determination. Among other objections it was urged that "the assessment is the basis of the tax as to its imposition, and must be in strict conformity to law, otherwise it is void and of no effect." The law then required the assessment rolls to be delivered on the first October, to the Board of Supervisors, who were to examine, equalize and correct the valuations. After this supervision, the rolls were to be delivered to the tax collectors, on the first Monday of December of each year. In the assessment made under these laws, the capital of the banks had been omitted; and a supplemental assessment was made in December which embraced the capital of the bank. The court sustained the tax imposed anterior to the law of the nineteenth March, exempting the banks from taxation. It said, "the law and Constitution require taxation to be equal and uniform, and by the seventy-fourth section it is provided that if lots, part of lots, squares, or other property be omitted in the assessment of one or more years, the same, when discovered, shall be assessed for the years during which it was omitted, and for the current year. Thus the validity of a tax levied in 1857 upon the assessment rolls of 1856, was sustained even after those rolls had been amended by a supplemental assessment made subsequent to the com-

pletion of the regular assessment rolls; and the Court overruled the objection which is reproduced in this case by the plaintiff's counsel in the same words, that as the supplemental assessment was made in December 1856, "the power to make the assessment was already exhausted." New Orleans *v.* Southern Bank, 15 Ann. 91.

This decision maintains the right of taxation upon the assessment rolls of the previous year, and even goes so far as to sustain the validity of the act, permitting the back assessment of property, when discovered, which had been previously omitted, *for the years during which it was omitted.*

The same doctrine was again laid down by the Supreme Court in the case of the City of New Orleans *v.* the Union Bank, 15 Ann. 123.

The judge *a quo* has fallen into a grievous error with reference to the object and effect of the assessment roll of 1867. He says, "it formed as against the parties named in it, a valid contract to pay taxes for that year," and that the act of 1868 *"creates* for it a new force, imposes from it a new duty, or obligation, or liability;" and he inquires "could it be made to create a similar obligation in a subsequent year?" A similar objection to a local tax imposed by the Board of Levee Commissioners in the parish of Carroll was met and answered by the Supreme Court in the case of Templeton *v.* the Board of Commissioners. There the Levee Board, in October 1859, laid a tax upon the assessment roll of 1858. The Court say with regard to such taxes, that "they cannot be said to be assessed, until the ordinance fixing their amount has been passed. When it is passed, it refers to the previous assessment of the State as the most convenient mode of ascertaining the persons liable to to the local tax and the amount for which they are responsible. It is not the State tax roll which creates the indebtedness for the local tax, it is the ordinance which levies the tax." Templeton *v.* Board Commissioners, 16 Ann. 118.

Now, whilst it may be true that the regular annual State tax may be said to be assessed upon the final completion of the assessment rolls, such is not the case with a special tax levied under a special statute. It is not the roll which creates the indebtedness; it is the special statute which levies the tax. In no sense can the imposition of a tax by the State be regarded as a contract. There never was a special tax imposed with the consent of all the tax payers.

It is a mistake to say that "an assessment of property should follow the act levying the tax;" and that "the tax and the assessment should be contemporaneous, that is, in the same year;" and that "the taxes of 1868 and the assessment of 1868, cannot be divorced." Plaintiff's brief, p. 30. Let any tax payer go to the State Tax Collector during the year 1868, and he will soon discover this mistake. Let him offer to pay the State tax on his property for that year, and his offer will be refused. Let him even go in the month of January, 1869, and his money cannot still be received, He will be told that his property has been assessed in the year 1868, but that his tax is not legally ascertained and has not been levied, and cannot be collected until the first day of February, 1869. Let him go to the City Hall, and offer to pay his city tax for 1868 at any time during that year, and he will be told that no step towards fixing its amount has yet been taken, except that his property is in process of assessment; and that in 1869 the rate of his tax will be fixed, according to the assessment of 1868, and he cannot pay the tax even then before June, 1869.

Thus the customary city and State taxes which our people have always been in the habit of paying, are infected with the same pernicious principles of "retroaction" which is said to exist in the statute of 1868. Yet the system has been acquiesced in by the community until now, with the approval of the courts.

Indeed, it is far more equitable and proper that taxes should be levied

after the value of the property to be taxed has been ascertained than before. Although the amount of a tax rests within the discretion of the taxing authority, it is yet wise and in accordance with the practice of Republican governments to demand of the citizen only such contributions as may be necessary to the service of the State. In order to fix the rate of taxation and prevent excessive and unnecessary, or insufficient taxation, it becomes important to know the value of the property liable to be taxed. This value is ascertained from the assessment rolls. Thus the exact amount of money required to be raised by taxation, and no more, and no less, becomes known, and taxation is fixed according to the exigencies of the government, and can be equally apportioned among individuals.

The mode of taxation complained of as being retroactive because the tax is levied upon a previous assessment, has been shown to be in accordance with usage in Louisiana, and to have been sanctioned by the courts. It is quite common, and has been adopted by this State from most of the States of the Union.

But it is said that under the clause of article 118 of the Constitution it is provided that "all property is to be taxed in proportion to its value, to be ascertained as directed by law ;" and that the terms "to be ascertained," imply a future assessment, and "as directed by law," and exclude the adoption of an existing assessment. *Ex vi terminorum;* no such future assessment is required. All that this clause in the constitution requires is that property should be taxed according to its value. And that its valuation shall be fixed or "ascertained" by law. A similar provision is to be found in most of the constitutions of the other States, but the construction claimed by the plaintiff's counsel has no where been sanctioned by authority.

"Whenever it is made a requirement of the State Constitution that taxation shall be upon property according to value, such a requirement implies an assessment of valuation by public officers at such regular periods as shall be provided by law, and a taxation upon the basis of such assessment until the period arrives for making it anew. Thus, the Constitutions of Maine and Massachusetts require that there should be a valuation of estates within the commonwealth to be made at least every ten years; the Constitution of Michigan requires the annual assessments which are made by township officers to be equalized by a State board, which reviews them for that purpose every five years; and the Constitution of Rhode Island requires the Legislature, "from time to time," to provide for new valuations of property for the assessment of taxes in such manner as they may deem best. Some other constitutions contain no provisions upon this subject; but the necessity for valuation is necessarily implied, though the mode of making it, and the periods at which it shall be made, are left to the legislative discretion." Cooley's Constitutional Limitations, p. 496.

In Ohio, whose Constitution, like ours, prohibits retroactive legislation, the Legislature in 1852 fixed the value of the real property of the State upon the valuation of the year 1851, and required that previous valuation to remain for "taxation for all purposes that are or may be required by law to be levied and collected" until a revaluation was made. Swan's Rev. Stat., p. 934. By the law of that State the assessment rolls of real property are revised and the valuation equalized "*every sixth year.*" Swan's Rev. Stat., p. 917. The legislation of Ohio on this subject is here particularly cited, because the plaintiff's counsel lay great stress upon the constitutional prohibition of retrospective laws in that State; and because no case can be found in Ohio where it has been held or even urged that taxes levied upon existing assessments were in conflict with the constitutional provision referred to.

In the case of Carrington *v.* Farmington, the town of Farmington at its annual meeting, on the first Monday of October, 1850, laid a tax of

four cents on a dollar, on the assessment lists of October, 1849, which was the assessment list of that town then last made, and on which an annual tax was laid in October, 1849, and duly collected.    The plaintiff claimed that said tax could not be legally laid upon said assessment list.    The Supreme Court of Errors of Connecticut held: "It rests with the Legislature alone to direct on what list a tax shall be laid; and the Legislature gives the range of two years, and it might give more; it might direct an assessment list to be made only once in three or five years.    This latitude may, and we believe not unfrequently does, lead to inequality in taxes, but this is the result of the latitude allowed by the law of 1826, rather than anything else.    Ever since that statute, and indeed before it, towns could lay a tax two years successively on the same list, while the property taxed had so changed hands that the taxes were actually imposed on persons who had sold their property, and not on those who had bought and enjoyed it.    Taxation, at best, is somewhat arbitrary and unequal.    Money is sometimes wanted immediately, so that a tax must be laid on the list last completed to meet the existing emergency, while sometimes delay is practicable."    21 Conn. Rep. p. 71.

In the case of Shaw v. Dennis, the Supreme Court of the State of Illinois thus disposed of an objection similar to that presented by the counsel in this case, to the statute of 1868.    Judge Caton in that case said: "There is another objection urged to the validity of this law. The act directs the commissioners, in determining who is liable to pay said tax and the amount each shall pay, to be governed by *the last assessment of taxable property in said county*.    It is insisted that this is an unjust criterion, for a man might have disposed of all the taxable property assessed to him in the last assessment, before this tax was actually declared by the commissioners.    This objection is more refined than practical, and if allowed, would at once annihilate the power of taxation.    The assessment of the tax and the valuation of the property are never simultaneous acts.    The county tax is assessed or declared by the county commissioners' court at their March term, and the assessment of the valuation and owners of the taxable property need not be completed till September following.    Under this system the same injustice may be committed, for a man may be compelled to pay a tax for a whole year on property which he has only owned for a single day. Indeed, the same horse may be assessed to two different individuals for the same year, for each might own him at the time the assessor takes the list of his property, and yet a third person may have owned him at the time the tax was actually imposed.    In the same way other property might go unassessed altogether.    In the imposition of taxes, exact and critical justice and equality are absolutely unattainable.    If we attempt it we might have to divide a single year's tax upon a given article of property among a dozen individuals who owned it at different times during the year, and then be almost as far from the desired end · as when we started.    The proposition is Utopian.    The Legislature must adopt some practical system, and there is no more danger of oppression or injustice in taking a former valuation, than in relying upon one to be made subsequently.    We have no doubt but this act is clearly within legislative power, and must be enforced."    5 Gillman Ill. Rep. p. 418.

In Pitcher v. Jackman, *et al.*, the Supreme Court of Indiana held that the appraisement of the real estate of the State made under a statute passed in 1851 was adopted by an act passed in 1852, and should stand as the "grand levy of the State," and sustained a tax levied in 1857 upon the appraisement of 1851.    The court thus disposes of the objection as to the want of equality and uniformity in the tax; "It is contended that the appraisement and valuation in question had ceased to be equal and uniform before 1857, the year in which the tax against

the appellee was levied.   It is true, the Constitution, article 10, section 1, declares 'that the General Assembly shall provide by law for an equal and uniform rate of assessment and taxation,' etc.   But we perceive no such want of uniformity on the face of the act continuing the assessments made in 1851; and if, in point of fact, these assessments had in 1857 ceased to be uniform, it was for the Legislature, and not the courts, to secure the desired uniformity.   Evidently, the courts are invested with no authority appropriate to such a duty."   15 Indiana Rep. p. 109.  See Aulauier v. the Governor, 1 Texas 653; and also Municipality No. 2 v. Duncan, 2 Ann. 183;  State v. Poydras, 9 Ann. 165; Layton v. New Orleans, 12 Ann. 515.

LUDELING, C. J.   The plaintiff obtained an injunction against the defendant to restrain him from collecting the taxes levied upon plaintiff's property, by an act of the General Assembly of the State of Louisiana, approved on the twenty-ninth day of September, 1868.   The petitioner avers that the tax is illegal; that the act No. 114, of the General Assembly, approved twenty-ninth of September, 1868, is not law, and is without force or validity; that it was not passed with the forms and solemnities prescribed by the Constitution of Louisiana, and that its passage was in violation of article forty-two of the said Constitution; that it was not read in each house on three several days; and that fourfifths of each house, which passed it, did not order a suspension of the Constitutional rule requiring such reading.   That said act is also in contravention of articles one hundred and ten, and one hundred and eighteen of the Constitution aforesaid; that it is retroactive, and is forbidden; that it attempts to impose a taxation not equal and uniform, and to tax property not in proportion to its value to be ascertained as directed by law.

The defendant admitted that, in the discharge of his duties as tax collector, he did notify the plaintiff as set forth in the petition, and did attempt in a legal manner to collect the tax; and he avers, that while attempting to do so he was restrained by the injunction issued in this case.   He prays that the injunction may be dissolved, and that plaintiff be condemned to pay all costs with twenty per centum general damages, etc.

The District Court rendered judgment in favor of the plaintiff, perpetuating the injunction; and the defendant appealed.

The questions to be decided are—

I.   Was the tax act of the General Assembly of September 29, 1868, passed without observing the formalities required by the Constitution of this State?

II.   Is it retroactive?

III.   Is it equal and uniform; and does it tax all property in proportion to its value to be ascertained as directed by law?

*First.*—We deem it unnecessary in this case to decide whether courts are authorized to go behind an enrolled and duly authenticated and promulgated statute to examine the journals of the Legislature, or

other evidence, to ascertain if the formalities prescribed by the Constitution have been observed in its passage; for, if we admit the right, we find in the journals of the House, proof that the requirements of the Constitution were observed.

"Mr. Morey, of Ouachita, *under a suspension of the rules*, offered the following bills, which passed their first and second readings, one hundred and fifty copies of each ordered to be printed, and bills referred to the Committee on Ways and Means."—House Journal, p.

So far as we are informed, this action was unanimous. No one opposed the suspension of the rules; no one tested its correctness by calling for the yeas and nays.

But it is contended by the plaintiff's counsel that "according to grammatical construction * * all that was done here, 'under a suspension of the rules,' was the introduction or 'offering' of the bills." In construing a law, and, *a fortiori*, an entry in the journals of the House, we are to have reference to the object or intention of the Legislature rather than to the niceties of grammatical rules. C. C. arts. 14–16. Commercial Bank *v.* Foster, 5 An. 516; 6 An. 386. State *v.* Poydras, 9 An. 165.

The journals show, not only that notice of the bill previous to its introduction, and the taking it up in its order were dispensed with, but also that the bill "*passed its first and second readings*" under a suspension of the rules. We must construe this entry of the journals so as to make the acts of the members of the House conform to their *sworn duty*, rather than in such a manner as to make the legislators recreant to their constitutional obligations.

We can see no room for doubting as to what is meant in article forty-two of the Constitution by "four-fifths of the House." The article declares: "No bill shall have the force of a law, until, on three several days, *it be read in each house* of the General Assembly, unless *four-fifths of the house*, where the bill is pending, may dispense with the rule."

Article thirty-three declares, Not less than *a majority* of the members of each house of the General Assembly *shall form a quorum to transact* business." It is competent then, for a majority of the members of each branch of the General Assembly *to entertain the reading of a bill;* and when *only a majority* of the members are present, *they* constitute the house.

Therefore, by the terms "each house" and "the house" in article forty-two must be meant the quorum necessary to do business; "*the* house" mentioned in the second clause of the article evidently refers to the same house mentioned in the preceding clause. See 1 Kent's Com. p. 249; note b. Pascal's Annotated Constitution, p. 93, and authorities there cited.

*Second.*—We think the law is not retroactive. It has no retrospective effect; it does not operate upon any contract, or right, or subject, in *the*

*past*, but it provides simply that a tax for the payment of existing debts shall be levied "upon the cash assessed value of the immovable and movable property of the State, according to the assessment rolls for the year 1867," the last assessment which, at that time, had been made.

"Every law that is to have an operation before the making thereof is retrospective." 3 Dal. 349. The converse of this proposition is equally true, and in our opinion the act of the twenty-ninth of September, 1868, is altogether prospective in its operation.

In the case of Municipality No. 1 *v.* Wheeler & Blake, the defendants contended the act of seventh of February, 1850, empowering each of the municipalities of New Orleans to levy taxes on capital *on the assessment rolls of* 1848 *and* 1849, was unconstitutional and void, *because it was retroactive in its operation.*

The Constitution of 1845, in existence when the law was passed, did not prohibit retroactive legislation.

The court, referring to this fact, said: "However repugnant to logic and sound policy they may be, retrospective laws in civil matters, do not violate the Constitution, unless they tend to divest vested rights, or to impair the obligation of contracts, neither of which can be predicated of the act in question.  * * * *

"But the law under consideration does not seem to be obnoxious to severe censure. It is not strictly speaking a retrospective law. It authorizes the *future* imposition and collection of a tax *according to a past assessment.* Shaw *v.* Dennis, 5 Gillman 418; Opelousas and G. W. R. R. Co. *v.* Harris, 10 An. 677."

It is contended that this is an *obiter dictum*, and not binding even on the court which made it. It is true that the case might have been decided without passing on this point, but unquestionably the court had the right to decide the question, for it was presented by the pleadings and in the arguments before the court. And from the dissenting opinion of Mr. Justice Buchanan, as well as the statements of the plaintiff's counsel, who was the organ of the court in announcing the opinion of the court in that case, it seems that the question was maturely considered and fully discussed. The reason, therefore, for not heeding *obiter dicta* does not exist in this case. This decision was reaffirmed in New Orleans *v.* Cordeville & Lacroix, 13 An. 268; New Orleans *v.* Poutz, 14 An. 853; and in New Orleans *v.* Locke, 14 An. 854. The last case was appealed to the Supreme Court of the United States, and is reported in 4 Wallace, p. 173   That court said: "There is nothing in the position taken, which entitles it to consideration. In the first place *the act was not subject to the imputation of being retrospective. It did not operate upon the past*, or deprive the party of any vested rights. *It simply authorized the imposition of a tax according to a previous assessment.*"

This too is said to be *obiter dictum*. Be it so. It was the opinion of nine Judges of the highest tribunal in the country. And after a careful examination of it, our judgments approve it. See city of New Orleans *v.* the Southern Bank, 15 An. 123; 16 An. 119. Also Cooley's Constitutional Limitations, p. 496. Carrington *v.* Farmington, 21 Conn. Rep. 71.

*Third.*—This law imposes an equal, uniform and ad valorem tax; one per centum is to be levied upon the cash assessed value of the immovable and movable property of the State. No discrimination is made. See State *v.* Volkman, recently decided.

The value is "to be ascertained as directed by law;" that is, the law shall direct *how* the value shall be ascertained. In this case the law directed that the value should be ascertained by adopting the assessment last made in the State. The exercise of a discretion vested in the Legislature by the Constitution cannot be questioned by this court.

Judge Cooley in his treatise on the Constitutional Limitations which rest upon the legislative powers of the States of the American Union, says: "It is not essential to the validity of taxation that it be levied according to the rules of abstract justice. It is essential that the Legislature keeps within its proper sphere of action, and not impose burdens under the name of taxation which are not taxes in fact; and its decision must be final and conclusive. *Absolute equality and strict justice are unattainable* in tax proceedings. The Legislature must be left to decide for itself how nearly it is possible to approximate so desirable a result. It must happen under any tax law that some property will be taxed twice, while other property will escape taxation altogether. Instances will occur where persons will be taxed as owners of property which has ceased to exist. Then the man who owns property when the assessment is taken may have been deprived of it by accident or other misfortune before the tax becomes payable; but the tax is nevertheless a charge against him. And when the valuation is only made once in a series of years, the occasional hardships and inequalities in consequence of relative changes in the value of property from various causes become sometimes very glaring. Nevertheless, no question of constitutional law is involved in these cases, and the legislative control is complete." Cooley's Constitutional Limitations, 413.

The same author says, "In Shaw *v.* Dennis, 5 Gillman 418, objection was taken to an assessment made for a local improvement *under a special statute*, that the commissioners in determining who should be liable to pay the tax, and the amount each should pay, were to be governed by *the last assessment of taxable property in the county.*

It was insisted that this was an unjust criterion, for a man might have disposed of all the taxable property assessed to him in the last assessment before this tax was actually declared by the commissioners. The court, however, *regarded the objection as more refined than practical*, and one that, if allowed, would at once annihilate the power of tax-

ation. "In the imposition of taxes, exact and critical justice and equality are absolutely unattainable. * * * The proposition is Utopian. . The. Legislature must adopt some practical system; and there is no more danger of oppression and injustice in taking a former valuation than in relying upon one to be made subsequently." 5 Gill. Ill. 418; Petcher v. Jackman, 15 Indiana R. 109; 1 Texas R. 662.

We cannot perceive wherein the statute in question violates in any manner, the Constitution of this State.

It is therefore ordered, adjudged and decreed, that the judgment of the District Court be avoided and reversed, and that there be judgment in favor of the defendant, dissolving the injunction issued in this case, with twenty per centum on one hundred and thirty-five dollars, amount of taxes whereof the collection was enjoined, as general damages, and that the plaintiff pay the costs of both courts.

Rehearing refused.